## Case No. 12,149.

### RUSSELL v. ALLEN.

[5 Dill. 235; 8 Cent. Law J. 314; 7 Reporter, 614.] [1]

Circuit Court, E. D. Missouri. March 17, 1879.[2]

CHARITIES — CONVEYANCE IN TRUST — BENEFICIARIES.

A conveyance of realty and other property, in trust, "for the purpose of founding an institution for the education of youth in St. Louis county, Missouri," sustained.

Charitable trust for the education of youth in St. Louis county, Missouri, sustained.

This is a bill in equity by the heirs of William Russell, deceased, to subject to their demands certain funds in the hands of Allen, by him received in connection with the grants made. A demurrer to the bill is interposed.

In 1855 the decedent executed to Horner certain conveyances of realty and other property, in trust, "for the purpose of founding an institution for the education of youth in St. Louis county, Missouri." The deed prescribed the manner in which said trustee should execute his trust. The deed expresses that the conveyances were "for the use and benefit of the Russell Institute, of St. Louis, Missouri," and directed that the proceeds of said property should be paid over, "in cash, as often as once in each year, or oftener, if convenient, to Thomas Allen, president of the board of trustees of the said Russell Institute, at St. Louis, Missouri, and his receipt therefor shall be a full discharge of the said" trustee, Horner. There were several deeds executed by the grantor, at the same time, for property in different counties in the state of Arkansas, and the deed before us, of July 19th, 1855, declares as follows: "And, whereas, the said party of the first part hath, by three several other deeds, bearing even date herewith, conveyed to the said party of the second part all his property in the counties of, etc., in the like manner and for the like uses and purposes as herein, now it is hereby

declared that all of said conveyances, together with the present one, are made to one and the same person, Horner, for one and the same use and purpose; and that the same are, and are to be deemed, and taken, and accounted for as one trust, according to the conditions of the deeds respectively—it having been intended by said deeds to convey all the remaining property of the said William Russell in the state of Arkansas to the said party of the second part, to and for the use and benefit of the said trustees of the Russell Institute, of St. Louis, Missouri, represented by their president as aforesaid." The bill charges that said Horner paid to said Allen divers sums of money, etc.; that no such institute existed at the date of the grants, or has since been created; that the purposes of the charity are too vague to be enforced, etc., and asks that said Allen be compelled to account for and pay over the funds, etc., so received by him to said heirs.

William Brown, for plaintiff.
Thoroughman & Warren, for defendant.

Before DILLON, Circuit Judge, and TREAT, District Judge.

TREAT, District Judge. The legal and equitable propositions involved have been discussed at great length in many English and American decisions, a review of which would require more time and labor than are at our command. Many of those decisions pertain to the force and effect of the statute of Elizabeth, the doctrine of cy-pres, and the power "parens patriæ." In this country, after long doubt and disputation, the doctrine has been established that where a grant or devise for charitable uses is made, and the donee is capable of executing the trust vested in him, the grant on devise should be upheld if the beneficiary or charitable object is stated in such a manner or with such distinctness that chancery can ascertain what it is, so as to enforce the trust. In construing such instruments, equity adopts, not the old rule favoring the heir, as in England, but the juster rule of effecting the intent of the grantor or devisor. In England, the doctrines of cy-pres and of "parens patriæ" were resorted to mainly to overcome the general rule which, under British institutions, favored the heir and perpetuation of estates. Under American institutions, no such policy, and, consequently, no such general rule, ever obtained. The just rule worked out in English courts, through the doctrines or powers named, although such powers do not exist in this country, is, as to charitable uses made, though not technically, yet, to a large extent, practically, applicable in this country. By this it is not meant that the cy-pres doctrine has any force here, but merely that, for the purpose of upholding conveyances for charitable uses, American courts of equity will, wherever by a liberal construction it can be done, ascertain the designated or de-

---

[1] [Reported by Hon. John F. Dillon, Circuit Judge, and here reprinted by permission. 7 Reporter, 614, contains only a partial report.]

[2] [Affirmed in 107 U. S. 163, 2 Sup. Ct. 328.]

signed charity, and enforce the intention of the grantor. The various decisions of the United States supreme court, and of other courts, particularly within the past decade, are based on the sound and just doctrine that the intention of the grantor or devisor shall prevail. Hence, when, by the terms of the grant, it is clear that the heir was to be cut off, he will be held to be cut off if the trust can be, under even a liberal construction, upheld for its designed charitable purpose.

Of course, if the grant is too vague and indefinite to enable the chancellor to detect to what charity the grant referred or was applicable, then, as the estate was not conveyed away, it (the estate) would necessarily follow the prescribed course of descent. In other words, if the decedent had not disposed of his property otherwise, the law of descents and distributions would govern. In the light of these doctrines, now fully recognized, this court must look to the conveyances in question. The purpose of the grantor was to found the Russell Institute—to have the avails of the property conveyed vested ultimately in a board of trustees for said institute, and, in the meantime, to have yearly and other payments of said avails or proceeds paid over to Allen, president, and, what is very significant, to him as representing said trustees.

It is obvious that the grantor knew that no such institute existed at the date of the grant; for the grant was to found such an institute in the future. In that condition of affairs, he expressed, with sufficient clearness, that, as the fund should be created from time to time by Horner, the trustee, it was to be paid over to Allen, as president, whose "receipt therefor was to be a full discharge;" and that, at the expiration of the ten years named, Horner's trust was, as soon as practicable thereafter, to cease, and all funds then in his hands to be paid, in the same manner as prior payments had been made, to said Allen, who, as president, was to represent said board of trustees.

It is obvious that the intention of the grantor was to have the proceeds of the property lodged in the hands of Allen, not for his individual benefit, but for the purpose of founding thereafter the designated institute, of which Allen was to be president.

In the discharge of his trust, then, it is for Mr. Allen, at the proper time, to cause such an institute to be organized, whose trustees will shape the institute and determine the persons to whom and the manner in which endowment shall be applied.

It is obvious that the grantor placed the largest measure of confidence in Mr. Allen with respect to the manner of founding such institute or calling it into corporate existence. Until sufficient funds were received therefor, such an institute could not be beneficially founded. Of course, Mr. Allen could not unreasonably delay action, nor postpone the time indefinitely. In other words, the confidence reposed, if abused by unnecessary delay or otherwise, could be controlled by the supervision of the proper court of equity, when thereto duly called upon to act. It seems that the purpose of Mr. Russell, in creating or providing for the needed endowment, did not contemplate that the result could be achieved before the lapse of ten years; for the annual payments to Allen from the date of the conveyances, it is obvious, would not furnish funds sufficient for founding such an institute at the expiration of the first or of any succeeding year prior to the expiration of the tenth year, when Horner's trust was to cease by forced sales of the property, with the exceptions named. In the meantime, Allen, receiving the annual payments and giving to Horner acquittances, was to retain the accumulating funds, until, at the expiration of the ten years, he should be able to ascertain the aggregate amount applicable to the charitable use. He could not ascertain the amount before that time, and, hence, any previous attempt to call such an institute into corporate existence would have been premature. It appears that the controlling intent of the grant is that the accumulating funds should be placed in Allen's hands, so that at the expiration of ten years he could cause such an institute to be founded, under the corporation laws of Missouri, with a board of trustees, of which he was to be president; and that when said corporation had been so created, he should turn over to it the aggregate funds in his hands. The board would thus be enabled to determine, in its discretion, with due regard to the intent of the founder, what should be the scope and details of the institute. The ultimate determination of the mode of administering the charity, whether by free or paid instruction to pupils, etc., would be for that board's action and discretion when organized.

There are many interesting questions involved in the administration of such charitable uses which are not before us for decision, such as the proper forum and parties to compel due and prompt administration of the "use" when the person charged to act fails to do so—that is, whether a United States court, before which the subject comes incidentally, can lay hold of and compel the proper administration, under its supervision, or whether application therefor must not be made exclusively to the more appropriate state courts. However that may be, in the absence of any proceeding by Allen in the nature of a cross-bill, asking the direction of this court as to the manner in which he shall execute his trust, and in the absence of any prayer of the plaintiffs in this case looking to that end, we are not called upon to decide with respect thereto. We must dispose of the questions before us as they are presented, and not go beyond them. The plaintiffs are here in hostility to the existence of the indicated fund, denying that there is such a fund for the alleged charitable uses, and claiming that the funds rightfully belong to them, per-

sonally. They do not ask for the administration of the fund to charitable uses; whereby their personal claim thereto would be defeated; and, consequently, this court has only one proposition to decide, viz.: whether, under the grants made and the allegations of the bill, the plaintiffs have shown any right in themselves, personally, to the fund in question. From what has already been stated, it is clear that they have no such personal right —that it is evident the grantor meant to cut off his heirs as to the property granted, and that the charity which was to be the object of his bounty is sufficiently defined to enable the funds created to be definitely applied to the charitable use contemplated.

The demurrer to the bill is sustained. Bill dismissed.

[On appeal to the supreme court, the decree of this court was affirmed. 107 U. S. 163, 2 Sup. Ct. 328.]